**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>RITE AID CORPORATION, et al.,[1]<br><br>　　　　　　　Debtors. | Chapter 11<br><br>Case No. 23-18993 (MBK)<br><br>(Joint Administration Requested) |
| RITE AID CORPORATION, et al.,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>MCKESSON CORPORATION,<br><br>　　　　　　　Defendant. | Adv. Pro. No. 23-01294 (MBK) |

---

[1]   The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid.  The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

**APPLICATION IN SUPPORT OF THE DEBTORS' REQUEST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

The above-captioned debtors and debtors in possession (collectively, "**Rite Aid**" or the "**Debtors**") respectfully submit this application in support of their request for temporary, preliminary, and permanent injunctive relief (the "**Application**"), and state as follows:

**PRELIMINARY STATEMENT**

1.      Just hours before the Debtors' chapter 11 filing, and despite weeks of productive discussions between the Debtors and McKesson Corporation ("**McKesson**," and together with the Debtors, the "**Parties**"), McKesson blindsided the Debtors' management by purporting to "terminate" a vital supply agreement with the Debtors (the "**Supply Agreement**") after failing to obtain the Debtors' surrender to impossible new terms proposed in the final days of the Parties' negotiations.  McKesson's cynical ploy of "terminating" the Supply Agreement is invalid as a matter of law and risks irreparable harm not just to the Debtors but to the millions of customers who rely upon the essential medications provided by Rite Aid as supplied by McKesson pursuant to the Supply Agreement.  Absent the Debtors' requested injunctive relief, the damage to Rite Aid would be irreversible, perhaps even existential—but even more importantly, the impact on Rite Aid's customers could be catastrophic.

2.      The Parties have been engaged in discussions regarding the Supply Agreement since this summer.  In the last month, the Parties' highest levels of leadership (including the Parties' respective CEOs and CFOs) held multiple meetings—both remotely and in person at McKesson's corporate headquarters in Texas—during which Rite Aid confided in McKesson, pursuant to a confidentiality agreement, about the possibility of a chapter 11 filing.

3.      Those negotiations were productive as the Parties exchanged multiple term sheets. However, in the days leading up to the Debtors' chapter 11 filing, McKesson suddenly shifted the

dynamic of the Parties' negotiations, demanding onerous new terms that were simply not possible given the realities of the Debtors' capital structure and need to reorganize.  When the Debtors declined those terms, McKesson threatened not to abide by the terms of the Supply Agreement during the chapter 11 proceedings.  Confronted with the illegality of that threat, McKesson chose the nuclear option and—just *36 hours* prior to the Debtors' chapter 11 filing—sent a notice purporting to terminate the Supply Agreement on the unfounded and pretextual assertion that Rite Aid was insolvent under 11 U.S.C. § 101(32).

4.      Despite multiple opportunities to withdraw its termination notice, McKesson has instead chosen to put the Debtors' reorganization and thousands of customers' health at risk. McKesson's brinksmanship is both reprehensible and unlawful and should be enjoined.

5.      For nearly 20 years, McKesson has supplied Rite Aid's pharmacies with pharmaceutical products on a "just-in-time" basis.  In fact, the Debtors purchase nearly all of their branded and generic pharmaceutical products from McKesson, accounting for 98% of the dollar volume of the Debtors' prescription drugs in their Retail Pharmacy segment.  Those medications are then distributed by Rite Aid to millions of customers at over 2,100 retail pharmacy locations in 17 states—many of which are located in underserved communities.  Indeed, Rite Aid relies on McKesson's performance under the Supply Agreement to fill nearly 672,000 prescriptions each day.

6.      The Debtors rely entirely on the goods and services provided by McKesson and cannot simply turn to alternative suppliers in short order to meet the needs of its customers. And due to the "just-in-time" nature of McKesson's shipments, Rite Aid does not have an inventory of pharmaceutical products that it can draw upon to provide customers with their essential medications.  Even a brief pause in the procurement of pharmaceuticals provided by McKesson

will have a disastrous effect on the Debtors' businesses and their ability to reorganize, as well as the health of its millions of pharmaceutical customers who rely on Rite Aid to provide them with vital medications, health services, and vaccines.

7.      McKesson's gambit is dangerous, and its purported termination is invalid as a matter of law. McKesson has no basis to assert that Rite Aid is insolvent as defined by the Bankruptcy Code—and the Debtors seek a determination to the contrary through their request for Declaratory Judgment.  Pending that determination, injunctive relief to maintain the status quo is essential.  It is for that reason that the Debtors seek a temporary restraining order and preliminary injunction enjoining McKesson's termination of the Supply Agreement and requiring McKesson's specific performance until this Court can rule on the merits of the Debtors' Declaratory Judgment claim.

8.      As detailed herein, the Debtors meet each of the requirements for their requested injunctive relief.  The Court should grant the Debtors' request for temporary, preliminary, and permanent injunctive relief because (i) the Debtors are likely to succeed on the merits (*i.e.*, likely to successfully restructure and to defeat McKesson's baseless purported termination); (ii) denial of relief will irreparably harm the Debtors, (iii) granting preliminary relief will not result in greater harm to McKesson; and (iv) the preliminary injunction is in the public interest. ***First***, the Debtors are likely to successfully restructure due to Rite Aid's strong existing capital structure, delayed debt obligations, the structure for a restructuring support agreement, and experienced advisors. Additionally, the Debtors are likely to obtain their requested declaratory relief because McKesson's termination of the Supply Agreement was invalid and unlawful under the Bankruptcy Code and the terms of the Supply Agreement. ***Second***, because McKesson is essentially Rite Aid's exclusive supplier of pharmaceutical products, if McKesson does not perform under the Supply

Agreement and refuses to provide pharmaceuticals to Rite Aid pharmacies, it is highly likely that the Debtors will not be able to operate and successfully restructure. **Third**, if the requested injunctive relief—*i.e.*, requiring McKesson to honor its commitments under the contract—causes McKesson *any* harm, it is monetary and reparable, and pales in comparison to the harm McKesson's non-performance will cause to Rite Aid and its millions of customers. **Finally**, the public interest favors the requested injunctive relief because millions of Americans rely on McKesson-supplied and Rite Aid-delivered medications every day.

## JURISDICTION

9.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

10.     This adversary proceeding is a core proceeding as that term is defined in 28 U.S.C. § 157(b)(2).

11.     Venue of this adversary proceeding in this district is proper under 28 U.S.C. § 1409.

## PARTIES

### I.    **The Plaintiff**

12.     The Debtors

### II.   **Defendants**

13.     McKesson Corporation

## FACTUAL ALLEGATIONS

I.    **The Relevant Parties**

A.    **Rite Aid**

14.    Rite Aid has been on the front lines of delivering healthcare services and retail products to millions of Americans for more than 60 years.  A trusted and iconic brand that has a long history of serving thousands of American communities, Rite Aid's mission is to connect everyday care, drive down healthcare costs, and promote whole health for life.

15.    Rite Aid meets the consumer's fundamental need for pharmacy services through two segments:  Retail Pharmacy and Pharmacy Services.  On the retail side, Rite Aid employs more than 6,100 pharmacists and operates more than 2,100 pharmacies in 17 states.  Many of these pharmacies are located in underserved communities where customers do not have multiple viable options to procure necessary medications.

16.    On October 15, 2023 (the "**Petition Date**"), the Debtors commenced these chapter 11 cases by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their property and are managing their business, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.    **McKesson Corporation**

17.    McKesson is a diversified healthcare services leader that partners with biopharma companies, care providers, pharmacies, manufacturers, governments, and others to deliver healthcare insights, products, and services.

18.    McKesson operates its business in four reportable segments: U.S. Pharmaceutical, Prescription Technology Solutions, Medical-Surgical Solutions, and International.  Its U.S. Pharmaceutical segment distributes branded, generic, specialty, biosimilar, and over-the-counter pharmaceutical drugs, and other healthcare-related products in the United States. In addition, the

segment sells financial, operational, and clinical solutions to pharmacies (retail, hospital, alternate sites) and provides consulting, outsourcing, technological, and other services.

II.      **The Debtors' Relationship with McKesson**

19.      Since 2003, the Debtors have relied on McKesson to supply generic and branded pharmaceutical products. Over the past 20 years, no partnership has been more crucial to the Debtors' success than its relationship with McKesson.

20.      The Debtors purchase nearly all of their pharmaceutical products from McKesson. The McKesson partnership operationalizes a fundamental aspect of the Debtors' business: in 2023, pharmaceutical sales at over 2,100 retail pharmacy locations in 17 states accounted for approximately 71.2% of the Debtors' total drugstore sales.

21.      McKesson-supplied goods account for 98% of the dollar volume of the Debtors' prescription drugs and 90% of sales in their Retail Pharmacy segment.  Additionally, the Company paid approximately $9 billion to McKesson in fiscal year 2023, or approximately $750 million per month.  This amount represents approximately 55% of the Company's yearly spend for the Retail Pharmacy segment.

22.      The products that McKesson supplies to the Debtors are fundamental to the smooth operation of the Company's pharmacy segment, which is the primary source of sales for the retail business.  McKesson supplies the pharmaceutical products to each of the Company's 2,100 retail locations several times per week on a just-in-time basis.

23.      As of the filing of these chapter 11 cases, McKesson is the sole supplier to the Debtors for the majority of products within the Debtors' retail business.  The Debtors depend on McKesson to stock their shelves with medicines and other pharmaceutical products, and to fill prescriptions relied upon by the Debtors' customers for a range of health issues.

### III.    The McKesson Supply Agreement

24.    On February 17, 2014, the Debtors entered into an updated supply agreement with McKesson.  Among other things, the Supply Agreement contemplates McKesson: (i) continuing to provide all brand medications to the Debtors for dispensing in the Debtors' pharmacies; (ii) continuing to provide almost all generic medications to the Debtors for dispensing in the Debtors' pharmacies.

25.    On February 28, 2019, the Debtors and McKesson amended their agreement to extend the term of the agreement through March 2029, giving McKesson the essentially exclusive responsibility for supplying all brand and generic pharmaceuticals sold by the Debtors, and implementing a direct-to-store delivery model for the Debtors' retail locations.

26.    The Supply Agreement is an executory contract that is integral to the Debtors' ability to operate their business and continue as a going concern.  As of October 13, 2023, the Parties were both fully performing under the Supply Agreement. Indeed, as of the filing date of this Application, the Debtors continue to perform their obligations under the Supply Agreement.

### IV.    The Parties' Prepetition Business Discussions

27.    Commercial discussions between Rite Aid and McKesson began in earnest in the summer of 2023.  Given the centrality of the Supply Agreement—and Rite Aid's partnership with McKesson—to the Debtors' business, the Debtors reached out to McKesson more than a month ago to discuss a path forward in the event of a potential chapter 11 filing.  On September 14, 2023, McKesson and Rite Aid signed a non-disclosure and confidentiality agreement ("**Confidentiality Agreement**"), pursuant to which Rite Aid shared nonpublic information with McKesson.

28.    Rite Aid, through its advisors, facilitated discussions among McKesson and certain groups of Rite Aid's creditors, working out proposed details of the post-petition treatment of the

McKesson relationship, including timing, payment terms, and performance commitments. As is often the case where stakeholders are engaged in prepetition negotiations, competing interests gave rise to potential tradeoffs and likely compromises.

29.     An initial virtual meeting between Jeff Stein, Chief Executive Officer and Chief Restructuring Officer of Rite Aid, Matt Schroeder, Chief Financial Officer of Rite Aid, Brian Tyler, Chief Executive Officer of McKesson, and Britt Vitalone, Executive Vice President and Chief Financial Officer of McKesson took place on September 26, 2023. At that meeting, McKesson expressed interest in meeting again to advance discussions related to finding a mutually beneficial path forward between the Parties.

30.     On October 4, 2023, Mr. Stein, Mr. Schroeder, Mr. Tyler, and Mr. Vitalone met in person at McKesson's offices in Irving, Texas to review certain materials containing confidential information subject to the Confidentiality Agreement, including discussions of the potential treatment of critical vendors and a path forward in the event of a potential chapter 11 filing. During the October 4 meeting, Rite Aid proposed ways that a path forward could be mutually beneficial. At the conclusion of the October 4 meeting, it was Rite Aid's impression that all Parties were generally aligned as to the benefits of negotiating a global resolution. Rite Aid provided McKesson with materials identifying the remaining items for the Parties to work out in the next round of discussions.

31.     On October 10, 2023, Rite Aid received an initial term sheet from McKesson outlining the framework for a potential agreement between the Parties regarding the Supply Agreement. Rite Aid and McKesson engaged in what Rite Aid believed were productive discussions related to the initial term sheet. Rite Aid felt that significant progress had been made towards an agreement and, on October 11, 2023, Rite Aid returned a counter to McKesson.

Further discussions between the Parties revealed McKesson's frustration with Rite Aid's counteroffer.

32.     McKesson sent back a counter term sheet on October 13, 2023.  The counter term sheet marked a significant departure from the previous proposal. At this point, Rite Aid began to realize that the Parties may not be aligned in their vision for the future of the relationship and the potential for a global resolution.  Despite the perceived setback, there was never any suggestion from McKesson of any termination right in the Supply Agreement, nor did McKesson declare any intent to exercise such a right.

## V.     McKesson's Purported Termination of the Supply Agreement

33.     After several weeks of extensive negotiations, on October 13, 2023, McKesson suddenly reversed course, demanding that Rite Aid pay all amounts owed to McKesson, approximately $600 million, immediately after filing any chapter 11 petition.  McKesson's shift in position was not premised on any change in Rite Aid's performance, financial condition, or operations.  Rather, it was based on McKesson's perception of increased negotiating leverage.

34.     Though bewildered by McKesson's last-minute change in course, Rite Aid's advisors sought to continue negotiations, sending an updated term sheet to McKesson.  Rather than respond in good faith, on October 14, 2023, Britt Vitalone, McKesson's Executive Vice President and Chief Financial Officer, instead laid down an ultimatum:  Unless Rite Aid immediately agreed to pay McKesson in advance for all future deliveries starting Monday, October 16, McKesson would refuse to conduct business according to the terms of the Supply Agreement on a post-petition basis.  In short, Mr. Vitalone threatened to violate federal law by refusing to honor a pre-petition contract on a post-petition basis.

35.    After receiving Mr. Vitalone's email, bankruptcy counsel for Rite Aid and McKesson had a telephone conference at approximately [2:45 p.m.] Eastern on October 14, 2023. Rite Aid's counsel conveyed that well-settled law blocked McKesson from making good on Mr. Vitalone's threat.

36.    Far from being chastened when confronted with the unlawfulness of its threats, McKesson's intransigence only escalated.  Just an hour after the call among the lawyers for the Parties, McKesson tried a different approach.    At approximately 3:45 p.m. Eastern on October 14, 2023, counsel for McKesson delivered a letter to Rite Aid purporting to terminate the Supply Agreement (the "**Termination Letter**").  In the Termination Letter, McKesson claimed the "prior occurrence of an event of default pursuant to Section 12.1(c)(v) of the [Supply] Agreement" served as the basis for terminating the Supply Agreement.  Section 12.1(c)(v) of the Supply Agreement provides that an event of default occurs "if . . . a Party shall become insolvent within the meaning of 11 U.S.C. § 101(32)."    Yet, notwithstanding this language, McKesson offered no explanation or evidence of Rite Aid's purported "insolven[cy] within the meaning of 11 U.S.C. § 101(32)," nor did McKesson cite any other provision of the contract.[2]    Upon information and belief, McKesson had not undertaken any fair valuation analysis of the Debtors prior to sending the Termination Letter, much less one sufficient to support the assertions in that letter.  It was clear that any purported "termination" had nothing to do with Rite Aid's solvency.

37.    Immediately thereafter, the Debtors delivered a response to the Termination Letter, notifying McKesson that the purported termination was invalid and should be withdrawn

---

[2]    Section 101(32) defines the term "insolvent" under the Bankruptcy Code.  For a corporation to be insolvent under this section, "the sum of such entity's debts [must be] greater than all of such entity's property, at a fair valuation, exclusive of— (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of [chapter 11]." 11 U.S.C. § 101(32).

immediately.  The Debtors expressed their surprise at McKesson's attempt to terminate the Supply Agreement and notified McKesson that, if McKesson refused to honor the contract, Rite Aid intended to litigate the invalidity of the purported termination and McKesson's breach of the confidentiality agreement signed between the Parties.  The Debtors also alerted McKesson to the severe health risks to the Debtors' customers that would result from McKesson's actions.

38.    Thereafter, McKesson's Chief Financial Officer, Britt Vitalone, sent a proposal to Rite Aid.  Rite Aid immediately responded with a counter proposal noting that an offer from McKesson was untenable without an immediate retraction of the purported termination notice and a commitment to continue to ship pursuant to the Supply Agreement with certain limited modifications thereto.  Hours before the Debtors filed their chapter 11 petition, McKesson's outside counsel responded, stating that McKesson would supply product on Monday, October 16, but refusing to commit to supply product after that date without additional conditions not contained in the Supply Agreement or agreed to by the Parties.  McKesson did not revoke its Termination Letter, nor did it agree to comply with the Supply Agreement.

## VI.    The Debtors' Chapter 11 Filing

39.    On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the District of New Jersey.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The chapter 11 cases have not been substantively consolidated.

40.    An orderly process is necessary to comprehensively address the Debtors' operational, liquidity, and capital structure challenges.  Moreover, an orderly process—with support from key creditors—should help the Company maintain trade credit and obtain post-petition financing to preserve thousands of jobs, continue operations in chapter 11, and take the

necessary steps to right-size the business for a successful emergence.  And Rite Aid will work to develop consensus among all constituencies on an expedited basis to ensure the viability of the Company.

41.    Chapter 11 presents the best option for the Debtors to continue serving communities for the years to come.  The Debtors seek to emerge from chapter 11 stronger than ever, with a leaner balance sheet, a rationalized store footprint, and a more competitive business.  And most importantly, this chapter 11 process will allow the Debtors and its employees to continue their decades-long commitment to—and proud heritage of—meeting the healthcare needs of the communities they serve.

## INJUNCTIVE RELIEF SOUGHT

42.    By this Application, the Debtors seek: (i) a preliminary injunction restraining McKesson from unlawfully terminating the Supply Agreement and requiring McKesson's specific performance under that Agreement until the Bankruptcy Court can rule on the merits of the Debtors' claim for declaratory relief; and (ii) a temporary restraining order providing that same injunctive relief for the maximum duration allowed by law, or at least until the Bankruptcy Court can rule on the Debtors' request for a preliminary injunction.

## LEGAL STANDARD

43.    Federal Rule of Civil Procedure 65, made applicable in adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7065 and District of New Jersey Local Bankruptcy Rule 7065-1, empowers the Bankruptcy Court to issue temporary and preliminary injunctive relief.

44.    Section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see, e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004), *as*

*amended* (Feb. 23, 2005) ("Section 105(a) of the Bankruptcy Code expressly provides bankruptcy courts the equitable power to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'") (citing 11 U.S.C. § 105(a)); *accord In re LTL Mgmt., LLC*, 638 B.R. 291, 319 (Bankr. D.N.J. 2022).

45.     "The issuance of an injunction under section 105(a) is governed by the standards generally applicable to the issuance of injunctive relief in non-bankruptcy contexts." *In re Philadelphia Newspapers, LLC*, 423 B.R. 98, 105 (E.D. Pa. 2010); *see also Matter of Brennan*, 198 B.R. 445, 452 (D.N.J. 1996) ("In determining whether to issue a § 105 stay, bankruptcy courts also use [the] traditional four-pronged analysis.").

46.     To qualify for injunctive relief, a litigant must demonstrate: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that the granting of preliminary relief will not result in even greater harm to the non-moving party; and (4) that the public interest favors such relief. *In re LTL*, 638 B.R. at 319 (citing *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)).

47.     "In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully reorganize." *In re LTL*, 638 B.R. at 320 (citing *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 660 (E.D. Pa. 2011). "Moreover, to demonstrate a reasonable likelihood of success, a movant need only show the prospect or possibility that he or she will succeed, and need not prove same with certainty." *Id.* (citation omitted).

48.     Additionally, if plaintiffs can demonstrate a risk of irreparable injury, then the requisite strength of the merits claim depends on the balance of harms. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) ("How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the

plaintiff's claim on the merits can be while still supporting some preliminary relief") (citing *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

## ARGUMENT

49.     The Debtors satisfy all of the legal requirements for the issuance of the requested injunctive relief against McKesson.  First, the Debtors are likely to succeed on the merits, *i.e.*, the Debtors are likely to successfully reorganize (and will also succeed on the merits of McKesson's purported termination).  Second, the Debtors will suffer irreparable harm absent the requested injunctive relief—indeed, without an injunction, the Debtors might not be able to operate.  Third, injunctive relief will not cause McKesson significant harm, and what harm it could cause to McKesson would be purely monetary and remediable, and would pale in comparison to the harm to the Debtors and their millions of customers if the injunction is denied.  Finally, the public interest favors issuance of the injunctive relief—indeed, the health and well-being of millions of customers in thousands of communities across the nation demand it.

## I.     The Debtors Are Likely To Succeed On the Merits.

50.     The Debtors are likely to succeed on the merits of all issues before the Court.  First, the Debtors are likely to succeed on the merits of Rite Aid's reorganization because they have the support of a large portion of Rite Aid's existing capital structure, a framework for a Restructuring Support Agreement ("**RSA**"), and guidance by experienced advisors with a history of successfully reorganizing debtors.  Moreover, while not required to obtain injunctive relief, the Debtors are also likely to succeed on the merits of their declaratory relief claim contained in the Complaint because McKesson's purported termination of the Supply Agreement was invalid and unlawful.  McKesson has no basis to assert that the Debtors are insolvent under 11 U.S.C. § 101(32)(A) or Third Circuit legal authority, as required by section 101(32) of the Supply Agreement.  *See In re Trans World*

*Airlines, Inc.*, 134 F.3d 188, 193 (3d Cir. 1998) ("Whether a company is insolvent under the Bankruptcy Code is considered a mixed question of law and fact.").

51.     Bankruptcy courts within this District and within the Third Circuit evaluate the first factor of injunctive relief based on a debtor's ability to successfully reorganize.  *See In re LTL*, 638 B.R. at 320 ("In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully reorganize.") (citing *In re Union*, 460 B.R. at 660); *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752 (Bankr. E.D. Pa. 1986) ("[T]here must be a reasonable likelihood of a successful reorganization."); *In re W.R. Grace & Co.*, 386 B.R. 17, 33 (Bankr. D. Del. 2008) (discussing how reasonable likelihood of successful reorganization is "the test in a bankruptcy reorganization case.").

52.     Further, when evaluating injunctive relief sought by a temporary restraining order, especially in the early stages of a restructuring, courts have set a relatively low bar for debtors to show a likelihood of successful reorganization.  *See In re LTL*, 638 B.R. at 320 (holding that "although the success of [d]ebtor's reorganization is speculative at this early stage," debtor "need only show the prospect or possibility" of successful reorganization to prevail on the first factor.). Courts look to the debtors' business operations when evaluating the prospect or possibility of successful reorganization.  In *In re Union*, 460 B.R. at 660, for example, while evaluating the first factor of injunctive relief, the court observed that the debtor "'negotiated cash collateral agreements with . . . its acknowledged secured lender,' 'is paying adequate protection payments to . . . its disputed secured lender,' and 'continues to operate its [business].'" (quoting *In re Union Tr. Philadelphia, LLC*, 465 B.R. 765, 773 (Bankr. E.D. Pa. 2011), *aff'd,* 460 B.R. 644 (E.D. Pa. 2011)).  Accordingly, the court determined that "at this early stage in the proceedings [Union

16

Trust's] prospects for a successful reorganization remain viable and is entitled to additional time to formulate its plan of reorganization." *Id.*

53.    Here, the Debtors' prospects of a successful reorganization *are even stronger* than those examined in the Third Circuit cases cited above.  The Debtors have not missed a payment to McKesson, and they have not missed a payment on interest or principal of their loans.  They continue to operate with open doors every day, employing over 45,000 employees that are paid in full and on time, and filling nearly 672,000 prescriptions each day at over 2,100 pharmacies in 17 states.

54.    Moreover, the Debtors are *already* progressing towards a successful chapter 11 reorganization.  The Debtors filed for chapter 11 with a term sheet for a comprehensive restructuring transaction with significant support across its capital structure.  At this stage, there is no basis to find that the Debtors will be unable to reorganize.

55.    Although unnecessary for injunctive relief under section 105(a), the Debtors can also show that there is a likelihood of success that the Debtors will prevail on the request for declaratory judgment in their Adversary Complaint against McKesson.  The Debtors are likely to succeed on the merits of their declaratory relief claim because McKesson's purported termination of the Supply Agreement was invalid and unlawful.  McKesson has no basis to assert that the Debtors are insolvent as defined by section 101(32) of the Bankruptcy Code, as required by the Supply Agreement, and furthermore, Debtors have sufficient funds to continue purchasing goods from McKesson under the Supply Agreement.

56.    According to the Third Circuit, "insolvency . . . is defined in § 101(32)(A) of the [Bankruptcy] Code as a financial condition where an entity's debts exceed its property (at fair valuation)[.]"  *In re R.M.L., Inc.*, 92 F.3d 139, 144 (3d Cir. 1996).  "In determining a 'fair

valuation' of the entity's assets, an initial decision to be made is whether to value the assets on a going concern basis or a liquidation basis." *In re Am. Classic Voyages Co.*, 367 B.R. 500, 508 (Bankr. D. Del. 2007), *aff'd sub nom. In re Am. Classic Voyages, Co.*, 384 B.R. 62 (D. Del. 2008). "If liquidation in bankruptcy was not 'clearly imminent' on the transfer date, then the entity should be valued as a going concern." *Id.* (citing *In re Trans World Airlines*, 134 F.3d at 193).

57.    As highlighted by the court in *In re Am Classic Voyages*, "[t]he going concern threshold is very low; a debtor may be financially unstable, but it is still a going concern as long as the amount it could realize from converting its assets to cash in the ordinary course of business exceeds the expenses of conducting business." *Id.* (citing *In re Heilig-Meyers Co.*, 319 B.R. 447, 457 (Bankr. E.D. Va. 2004), *aff'd,* 328 B.R. 471 (E.D. Va. 2005)).

58.    Here, McKesson is without legal or factual justification for breaching the Supply Agreement on the basis of its unsupported allegations that the Debtors are insolvent.  There is no immediate risk of the Debtors' insolvency, and the Debtors will not face a maturity obligation for their prepetition-funded debt until 2025.

59.    Other potential concerns about the Debtors' short-term solvency are also misplaced.  Although Rite Aid faces numerous opioid-related liabilities, those claims are contingent upon the various plaintiffs succeeding in subsequent litigation, and there are no Rite Aid-related opioid trials until February 2024.  Finally, it appears that McKesson did not engage in *any* insolvency analysis, further undermining McKesson's justification for terminating the contract.

60.    These facts demonstrate that McKesson was unjustified in terminating the Supply Agreement on the pretextual basis that the Debtors were insolvent on October 14, 2023.  The Debtors are therefore likely to succeed on the merits of their declaratory relief claim.  More

importantly, however, all available information supports a finding that the Debtors are likely to successfully reorganize.

## II.    The Debtors Will Be Irreparably Injured By A Denial Of Relief.

61.    The Debtors' business will be irreparably and irreversibly harmed unless the requested relief is granted.  McKesson supplies nearly all of Rite Aid's pharmaceutical products that are necessary to meet the healthcare needs of millions of Rite Aid customers.  Even a temporary disruption to McKesson's supply of pharmaceuticals puts the Debtors' continued operation and ability to reorganize in jeopardy.

62.    Irreparable harm exists "if it cannot be redressed adequately by monetary damages."  *Crowe v. De Gioia*, 447 A.2d 173, 176 (N.J. 1982) (describing pecuniary damages as "inadequate because of the nature of the injury or of the right affected"); *see Scherman v. Stern*, 117 A. 631, 631 (N.J. 1922) (holding that "[a]cts destroying a complainant's business, custom, and profits do an irreparable injury and authorize the issuance of a preliminary injunction"); *see also In re Diamond Indus. Corp.*, 265 B.R. 707, 716 (Bankr. D. V.I. 2001) (holding that for a business, "ceasing to exist—is in our estimation a quintessential example of irreparable harm"). The fact that monetary compensation is involved "does not automatically preclude a finding of irreparable injury.  *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987), *holding modified by Am. Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994) (citing to United Steelworkers of Am. v. Fort Pitt Steel Casting, 598 F.2d 1273, 1280 (3d Cir.1979)).  Rather, finding irreparable injury turns on whether the harm is "of a peculiar nature, so that compensation in money alone cannot atone for it."  *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (citing to *Morton*, 822 F.2d at 372).

### A. McKesson Is A Critical Vendor.

63.     The Debtors rely on products and services provided by certain vendors (the "Critical Vendors") that enable them to effectively provide the healthcare-related goods and services and consumer staples that are critical to the business and Rite Aid's presence in the community.  McKesson is the most vital vendor to the Debtors' go-forward operations.

64.     The Debtors rely almost exclusively on their partnership with McKesson to fulfill the Company's prescription drug requirements.  After two decades of successful partnership, the Debtors purchase nearly all of their pharmaceutical products from McKesson.  Prior to the filing of these chapter 11 cases, McKesson-supplied goods accounted for 98% of the dollar volume of Rite Aid's prescription drugs and 90% of sales in the Retail Pharmacy segment.

65.     The Debtors' yearly spend for the Retail Pharmacy segment reflects the fact that McKesson is a critical vendor to the Rite Aid business.  On average, 55% of the Company's annual retail spend is earmarked towards McKesson purchases.  In fiscal year 2023, Rite Aid paid McKesson over $9 billion, or approximately $750 million per month.

### B. McKesson Is Critical to Keeping the Debtors' Retail Pharmacy Locations Open and Continuing As A Going Concern.

66.     The products that McKesson supplies to Rite Aid are fundamental to the daily operation of the Company's Retail Pharmacy segment.  Prior to McKesson's "termination" of the Supply Agreement, the Company received "just-in-time" deliveries to fill an average of 672,000 prescriptions per day for customers across the United States.

67.     In addition to the *supply* of medication, Rite Aid relies on McKesson for the *shipment* of medications to Rite Aid's 2,100 Retail Pharmacy locations.  Rite Aid does not have the ability to ship or order product to fill its inventory and fulfill customer needs without McKesson's IT system.  As a result, Rite Aid's central fill warehouse facility depends on the

McKesson partnership.  Any disruption to the central fill warehouse facility would overwhelm local Rite Aid pharmacies with more prescriptions than can be supplied, putting the viability of the business at risk, not to mention the health of countless customers.

68.    Under the "just-in-time" delivery system, retail pharmacies only have 1 to 2 days' worth of pharmaceutical drug supply at any time.  This means that unless the requested relief is granted, Rite Aid's central fill warehouse facility will not have pharmaceutical products to distribute to Retail Pharmacy locations.  Patients will be the first to feel the effects of the disruption.  Even if the Debtors could find another supplier, Rite Aid would not have the ability to immediately ship the pharmaceutical products for distribution, or order more into its existing warehouse facility, without leveraging McKesson's IT system.

69.    The Debtors depend on McKesson's continued performance under the Supply Agreement to stock their shelves with medicines and other pharmaceutical products, and to fill prescriptions relied upon by the Debtors' customers for a range of health issues.  McKesson-supplied products include:

| Pharmaceutical Product | Prescription | Total number of scripts filled in the last 90 days |
|---|---|---|
| Albuterol HFA 90 MCG Inhaler | For asthma, bronchitis, emphysema, and other lung diseases | 550,712 scripts |
| Duloxetine HCL DR 60 MG CAP | For depression and anxiety, pain caused by nerve damage from diabetes | 118,143 scripts |
| Eliquis 5 MG Tablet | For lowering the risk of stroke and/or blood clots | 159,028 scripts |
| Freestyle Libre 2 Sensor | For continuous glucose monitoring for diabetes | 51,827 scripts |
| Latanoprost 0.005% Eye Drops | For elevated intraocular pressure (IOP) in ocular hypertension or glaucoma patients | 98,420 scripts |
| Metformin HCL ER 500 MG Tablet | For treating high blood sugar levels caused by type 2 diabetes | 161,100 scripts |

70.     The Debtors' continued business operations, and by extension, the success of these chapter 11 cases, fundamentally depends on the Debtors' ability to continue distributing the goods and services that customers expect to be readily available at their local Retail Pharmacy location. If customers are faced with the prospect of delayed access to prescriptions and inventory or price increases necessitated by inventory shortage, many customers (those who are able) may turn to alternative healthcare sources in the market.

71.     As such, McKesson's non-performance under the Supply Agreement would irreparably harm the Debtors by destroying Rite Aid's goodwill in the communities where they operate, depriving the Debtors of critical revenue just as they start the restructuring process, and potentially forcing the Debtors to shut their doors and turn away millions of customers.

### C.     It Would Take Substantial Time to Find a Replacement Supplier

72.     It would be nearly impossible to find a new wholesaler on the same or better terms than the current Supply Agreement while in chapter 11.  Any potential contract counterparty is unlikely to offer favorable terms to the Debtors while in bankruptcy due to the Debtors' financial position and the inherent risks posed by these chapter 11 cases.  Even in normal circumstances, negotiations of this type are subject to intense regulatory and media scrutiny.

73.     The Debtors estimate that switching to another distributor would take at least six months due to the time needed to develop distribution channels and infrastructure.  Implementing an in-house distribution scheme would be extremely expensive, labor intensive, and would require regulatory approval.  The time and costs associated with replacing McKesson will irreparably damage the Debtors' Retail Pharmacy segment and keystone business, and potentially cause it to cease to continue as a going concern, not to mention disrupt the availability of customers' pharmaceuticals at the Debtors' Retail Pharmacy locations.

**III.**    **The Balance of Harms Favors Granting the Requested Relief.**

74.    Absent McKesson's continued performance under the Supply Agreement, the Debtors will experience swift and calamitous consequences to their business.  The ramifications are obvious—the Debtors will not be able to fill prescriptions until the Debtors find a new wholesaler and execute an agreement or establish self-distribution of pharmaceutical drugs for their central fill warehouse facility.  In contrast, granting the requested relief will pose minimal harm to McKesson—and any harm that might occur would be reparable.  *See Crowe*, 447 A.2d at 177 (holding that the balance of equities favored granting relief because the nonmoving party "would suffer relatively inconsequential expense if relief is granted" but by contrast, "withholding support from [moving party] would be devastating").

75.    The Debtors rely on critical vendors like McKesson for key products and services that are essential to the smooth functioning of the Debtors' businesses.  McKesson will be paid for the products it delivers during the pendency of the chapter 11 cases, pursuant to the Supply Agreement.  If that changes and the Debtors stop making post-petition payments as required by the Supply Agreement, then McKesson could cease performing as well.

76.    Importantly, any harm to McKesson resulting from an injunction would be purely economic in nature and thus reparable.  *See Morton*, 822 F.2d at 372 (holding in an employee discharge case that "we do not believe that loss of income alone constitutes irreparable harm" not because of "insensitiv[ity] to the financial distress" but because the claimed injury "is purely economic in nature and thus compensable in money").  Notably, an injunction would not jeopardize McKesson's ability to continue its operations.

77.    In addition to balancing the parties' relative harms, the United States Supreme Court has instructed that "parts of equity may, and frequently do, go much farther both to give and

withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Holland v. Rosen*, 277 F. Supp. 3d 707, 725 (D.N.J. 2017) (quoting *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (citation omitted)).  Here, whereas the Debtors' injury has both a private and public interest harm component, McKesson's harm is strictly private.  Thus, in addition to the fact that the Debtors' irreparable harm outweighs McKesson's de minimis harm, on balance, equity goes further towards granting the Debtors' requested relief because of the public interest involved.

## IV.    The Public Interest Weighs In Favor Of The Debtors' Request.

78.    Finally, the public interest overwhelmingly weighs in favor of granting the requested injunctive relief.  Millions of customers rely on the medications supplied by McKesson and sold by Rite Aid every day.  McKesson's attempt to stop those supplies and refuse to honor its Supply Agreement obligations without any notice or alternative literally puts lives in danger.

79.    Courts must consider the public interest in granting injunctive relief.  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002).  As a practical matter, where a plaintiff demonstrates a likelihood of success and irreparable injury, courts invariably find support in the public interest. *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).  Additionally, in considering the public interest, courts focus on "how the parties' specific actions would impact the public at large."  *See In re Roman Cath. Diocese of Syracuse, New York*, 628 B.R. 571, 583 (Bankr. N.D.N.Y. 2021) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. at 13-14, 129 S.Ct. 365).

80.    McKesson's failure to perform in accordance with the Supply Agreement has a direct impact on the public at large—namely the ability of Rite Aid customers to rely on their local pharmacies to fill their critical prescriptions.

81.    As noted above, nearly all of the prescription drugs purchased by Rite Aid's customers are supplied by McKesson pursuant to the Parties' Supply Agreement.  Without the constant and stable supply of pharmaceuticals from McKesson, the Debtors would not be able to fill prescriptions until they could find a new wholesaler, an extremely time intensive process that would leave millions of Rite Aid customers without access to life-saving prescriptions.  This harm is compounded by the fact that many Rite Aid pharmacies are located in some of the most underserved communities in America, where Rite Aid might be the only pharmacy available to customers for miles.

82.    Through its relationship with McKesson, the Debtors fill around 672,000 prescriptions per day.  These include vital prescriptions to treat patients suffering from health issues like lung disease, diabetes, depression, and anxiety.  For example, metformin, one of the most commonly prescribed drugs to treat type 2 diabetes, is supplied by McKesson.[3]  Additionally, albuterol inhalers help customers who suffer from asthma, bronchitis, and emphysema. McKesson's on-time deliveries have helped supply 550,712 scripts of albuterol inhalers to Rite Aid pharmacies in the past 90 days alone—scripts that would go unfilled if this temporary restraining order is not granted.

83.    Finally, with flu season just beginning, McKesson's failure to deliver essential vaccinations to Rite Aid locations has a direct impact on public health and interest. Rite Aid

---

[3]    Ziquan Lv and Yajie Guo, *Metformin and Its Benefits for Various Diseases*, 11 FRONT ENDOCRINOL 191 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7212476/.

customers rely on McKesson-supplied vaccines to help protect their communities against COVID, influenza, and RSV. Rite Aid is forecasted to spend $540 million with McKesson on COVID, flu, and RSV drugs for the upcoming flu season in FY 2024 to administer these vaccinations in communities across the country.

84.     The Debtors' ability to continue a go-forward business and generate revenue is directly tied to livelihoods and public accessibility to critical medicines and pharmaceutical products.  Many of the Debtors' 2,100 retail pharmacy locations are the only pharmacies available to customers for miles.  Customers served in these communities cannot afford a delay, much less afford to lose access to everyday and/or life-sustaining medications.

**V.  The Court Should Grant a Temporary Restraining Order to Effectuate the Relief Sought by the Debtors Pending an Order on the Debtors' Preliminary Injunction Request.**

85.     The Debtors respectfully request that this Court immediately enter a temporary restraining order to preserve the effectiveness of the automatic stay until this Court has the opportunity to rule on the Debtors' request for a preliminary injunction.  Specifically, the Debtors seek a temporary restraining order enjoining McKesson from terminating the Supply Agreement and ordering McKesson to perform its obligations under the Supply Agreement until the Court rules on the Debtors' request for preliminary injunctive relief or other further order of this Court.

86.     Bankruptcy Rule 7065 gives this Court authority to issue a temporary restraining order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure.  Rule 65(b) (by virtue of Bankruptcy Rule 7065) provides:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b);[4] Fed. R. Bankr. P. 7065.

87.     A temporary restraining order is properly granted where it is necessary to prevent immediate and irreparable injury pending a hearing upon a motion for an injunction.  *See In re Britestarr Homes, Inc.*, 368 B.R. 106, 108 (Bankr. D. Conn. 2007) (granting temporary restraining order until preliminary injunction could be ruled on "in order to maintain the status quo pending the continued hearing on the plaintiffs' motion); 13 Moore's Federal Practice – Civil § 65.36 (2023).

88.     The facts here satisfy the requirements for a temporary restraining order. As described above, McKesson's refusal to honor contractual obligations under the Supply Agreement risks significant, immediate, and irreversible harm to the Debtors and their estates. McKesson supplies ***nearly all of the pharmaceutical products*** that Rite Aid distributes to millions of its customers.  Rite Aid believes it would be nearly impossible to find a new comparable wholesaler while navigating through these chapter 11 cases.  Unless the requested relief is granted, Rite Aid's central fill warehouse facility will have no pharmaceutical products to distribute to Retail Pharmacy locations.  Not only will McKesson's purported "termination" of the Supply Agreement irreparably harm Rite Aid's continued business operations, but by extension, also millions of customers who rely on Rite Aid for their critical medicines and pharmaceutical products.  A denial of the Debtors' request for a temporary restraining order pending a ruling on the Debtors' request for injunctive relief would cause the very harm that the Debtors seek to prevent by this Motion and the Complaint.

---

[4]   Although Federal Rule of Civil Procedure 65(c) requires the posting of a bond as a prerequisite to a preliminary injunction, Bankruptcy Rule 7065 exempts an application made by a debtor, trustee or debtor in possession from the bond requirement.  Fed. R. Bankr. P. 7065.

89.    In similar circumstances, bankruptcy courts have issued temporary restraining orders enjoining debtors' suppliers from refusing to honor their contractual obligations to the debtors.  *See, e.g., In re Fas Mart Convenience Stores, Inc.*, 296 B.R. 414 (Bankr. E.D. Va. 2002); *Matter of Whitcomb & Keller Mortg. Co., Inc.*, 715 F.2d 375 (7th Cir. 1983).  Immediate injunctive relief is likewise required here to safeguard the Debtors' prospects for a successful reorganization.

90.    Although temporary restraining orders generally are limited to 14 days, before that period expires and for good cause, this Court may extend its order for an additional 14 days. Fed. R. Civ. P. 65(b)(2).  The Debtors request that this Court, for good cause, enter a temporary restraining order extending for the maximum period allowed under Civil Rule 65 and Bankruptcy Rule 7065, including an extension up to the date of a hearing on the Debtors' requested preliminary injunctive relief.  Granting such relief also will conserve time and resources for the Court and the Debtors' estates.

91.    In sum, for certain members of the public, granting the requested injunctive relief could be a matter of life or death.  Nothing can be more squarely in the public interest.

**WHEREFORE**, by reason of the foregoing, the Debtors respectfully request that: (i) McKesson be enjoined from terminating the Supply Agreement; (ii) McKesson be ordered to perform under the Supply Agreement until further order of this Court; (iii) the Debtors be awarded preliminary injunctive relief to prevent irreparable injury; and (iv) the Court grant such other relief as it may deem just and proper.

Dated: October 16, 2023

Respectfully submitted,

By: /s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (*pro hac vice* pending)
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*